KENNEDY'S HEIRS AND EXECUTORS v. KENNEDY'S HEIRS.

COLLIER, C. J.—The elaborate argument of this cause at the last term, and the full consideration given by the Court to the points made, had induced us to hope, that our opinion, however unsatisfactory, would be acquiesced in. But in this expectation we have been disappointed. The plaintiffs have presented to us a petition for a rehearing, in which is embodied a long and ingenious argument. The grounds on which the cause is asked to be reheard, are *First*—This Court is supposed to have erred in its view of the law of the case. *Second*—The decree of the Chancellor should have been reversed, because he decided the question of fact arising upon the proofs, instead of directing an issue to be tried by a jury. *Third*—The decree directs a conveyance to be made by the executors of Joshua Kennedy of the lands which Wm. E. Kennedy conveyed to their testator, though Joshua Kennedy acquired a portion of these lands by an independent and paramount title. *Fourth*—The decree is erroneous because it prescribes no day when the heirs of Joshua Kennedy shall show cause against the same, after attaining their majority.

*First*—We are entirely satisfied with the opinion that has been delivered. It rests upon authorities too numerous, and reasoning too cogent to induce us to doubt for a moment its entire correctness. The judges who lived nearest the period of the enactment of the English statute of frauds declared, that *it was intended to prevent and not to cover and protect frauds ;* and their successors following in their footsteps, have often reiterated the same declaration. And such at the present day is the current of decision, both in England and the United States. We will not undertake to affirm that there are no opposing *dicta* or adjudications, but certainly there are none to unsettle or disturb the general course of decision.

But it is insisted that the admission of evidence to show, that Wm. E. Kennedy was induced by the promises of Joshua (which have never been performed) to execute the deed of

December, 1824, or that Joshua had made a fraudulent use of that deed, would be to deny the authority of the statute, and equivalent in point of fact to its repeal. This argument upon its first presentation is specious, but really it has nothing of solidity. It is a cardinal rule in the construction of statutes, so to interpret them, that the intention of the law-maker may be carried into effect, and the spirit of the enactment preserved. Under the influence of this rule, the letter is frequently sacrificed to the general purposes and intention of the act. Although the admission of parol proof in opposition to the deed, would not according to a literal interpretation of the statute be allowable, yet its exclusion would oppose the spirit and intention of the law, which is the suppression of fraud; and it is on this ground that such evidence is admitted, consistently with the operation of the statute.

The legislature which enacted our statute of frauds, must be presumed to have been cognizant of the construction placed upon the English statute, and in adopting substantially the terms of that enactment, impliedly approved the judicial interpretation it had received. Such is the conclusion which reason would suggest, and it becomes doubly fortified by the consideration, that the legislature have employed no terms to countervail the effect of decisions made upon the English and American statutes of similar import.

With great deference we think the correctness of these views, and their application to the case before us would be obvious to the learned counsel for the plaintiffs, if they would reflect for a moment, that the jurisdiction exercised by a Court of equity, is more extensive than that, which is claimed for a Court of law, in cases of fraud. While the former may prevent the fraudulent use of a deed, or if obtained upon promises which have been falsified, may set it aside entirely, the latter only relieves where there is *fraud in its execution.*

*Second*—It may be regarded as a settled practice of equity, to direct *an issue at law,* where a question arises upon the validity of a will, and it would be irregular for the Court to render a decree against the heir until the invalidity of the devise had been found by a jury. 2 Har. Ch. prac. 126; 2 Bla. Com. 452; 1 Hoffin Ch. Prac. 502; 2 Story's Eq. 672; Pemberton v. Pemberton, 11 Ves. Rep. 52; Bootte v. Blundell, 19

Ves. Rep. 501; 1 Eq. Ca. Ab. 133. Blackstone in treating of the proceedings in equity says, " If matter of fact is strongly controverted this Court is so sensible of the deficiency of trial by written depositions, that it will not bind the parties thereby, but usually directs the matters to be tried by a jury; especially such important facts as the validity of a will, or whether A. is the heir at law to B. or the existence of a *modus decimandi*, or a real and immemorial composition for tithes." See also 2 Story's Eq; 696–7. But if the plaintiff's right is so clearly made out, as not to be doubtful upon the testimony what should be the verdict of a jury, the Court will render its decree without directing an issue : for the Court is not bound to refer to a jury every disputed fact. [Simmons v. Tillery, 1 Tenn. Rep. 274; Newman v. Milner, 2 Ves. Rep. 483.] The object of an issue is to satisfy the mind of the chancellor upon matters of fact, but if his conscience is satisfied without the aid of a verdict, it is competent for him to render a decree. [Mulock v. Mulock, 1 Edwd. Ch. Rep. 14; Apthorp v. Comstock, 2 Paige's Rep. 482; Rice v. Griffin, 1 Molloy Rep. 401.]

Lord Eldon said, there was no doubt but a Court of Chancery might take to itself the decision of every fact put in issue upon the record; and that anciently Courts of equity were more in the habit of deciding questions of fact than they have thought wise and discreet in later times, " as to the immemorial payment of tithes, if any reasonable doubt has been raised upon it in the evidence, it has been of late thought wise and discreet to send the question of fact to a jury. All the judges have demonstrated their opinion in favor of the practice, where any reasonable doubt is raised upon the facts." [O'Conner v. Cook, 6 Ves. Rep. 671; 8 Ves. Rep. 526; See also Blackburn v. Jepson, 17 Ves. Rep. 479; The Wardens of St. Pauls v. Morris, 9 Ves. Rep. 164.]

In Bree v. Beck, 1 Young's Rep. 243, the question was as to a *modus* and an issue was directed to try it. Baron Vaughan observed, "this is an issue directed by my Lord Chief Baron for the purpose of satisfying his conscience, and with a view to assist him in administering that relief in equity to which the parties may appear to be entitled. I take it to be clear, that it was competent to my Lord Chief Baron, if he had been so disposed, to have assumed to himself the deter-

mination of every matter of fact suggested by this record." So in Fornshill v Murray, 1 Bland's Rep. 485, it was said not to be indispensably necessary, that a Court of equity should direct an issue for the trial of a question of fact; and that it is only resorted to, where the weight of evidence can be better estimated by a jury. And in Apthorp v. Comstock, 2 Paige's Rep. 484, the chancellor remarked " although this Court (Chancery) in the exercise of a sound discretion, has a right to decide every matter of fact, which comes before it, without the intervention of a jury, yet there are some cases in which important rights, depending upon a mere question of fact, ought not to be decided without giving the defendant who has not come voluntarily into this Court, an opportunity to establish his claims before a jury." " It would be attended with infinite mischief" says Lord Redesdale "if Courts of equity were to hesitate in deciding on questions of fact, when sufficient evidence is before them." [Whalley v. Whalley, 3 Bligh's P. C. 16. And Chancellor Walworth remarks, that " issues should be directed only in those cases, where there is a want of evidence, or the testimony is contradictory and so nearly balanced, that it is necessary to have an open and rigid cross examination of the witnesses before the jury, who are to decide the question of fact upon their conflicting testimony." *And further*, where the primary Court had a right to decide the question of fact, without the intervention of a jury, the learned Chancellor was not prepared to say, that a party who did not ask for an issue could sustain an appeal, unless he is able to satisfy the appellate Court, that the decision was wrong upon the question of fact. [Townsend v. Graves 3 Paige's Rep. 453.]

In Nice v. Purcell, 1 Hen. & Munf. Rep. 372, it was decided, that a Court of equity was not bound to direct an issue, on the ground that the evidence before it is contradictory; but may judge of the weight of evidence, and if the conscience of the Court be satisfied, render a verdict without the aid of a jury. See also Rowton v. Rowton, ibid 92. And in Baltzell v. Hall's heirs 1 Litt. Rep. 98, the Court say " whatever ought to be the mode of liquidating uncertain sums in cases where the legislature has transferred to the Chancellor jurisdiction of controversies strictly legal, we have no doubt that in all cases

purely equitable, the Chancellor may ascertain and fix, without resorting to a jury or commissioners, all uncertain sums to be adjusted between the parties, as was decided by this Court in Head's heirs v. Head's Adm'rs. 4 Marshall's Rep.

We have examined with attention the citations made by the plaintiff's counsel to this point, and find that with few exceptions, they are in harmony with the cases we have noticed. True in Harrington et al. v. Horton, 1 Bro. Par. cases 140, the House of Lords reversed a decree of the Lord Chancellor, and directed an issue without pointing out any other objection to the dismissal of the bill, and although the Court of Chancery was not asked to send an issue to be tried by a jury. But in that case, the question was as to a *modus*, which may perhaps be considered as one of the excepted cases, in which an issue is indispensable.

In Knibbs v. Dixon's ex'r., 1 Rand. Rep. 249, the question was, whether an absolute bill of sale was intended only as a security. The evidence being contradictory, the Chancellor dismissed the bill at the hearing. On appeal, the decree was reversed, because the evidence should have been submitted to a jury on an issue made up between the parties. And Douglass v. McChesney, 2 Rand. Rep. 109, it was held, where it was doubtful upon the testimony whether the purchase of a horse by the complainant of the defendant, was made upon a real *bona fide* sale, or as a mere shift to evade the statute against usury, an issue should be directed to try the fact. For the failure thus to proceed, the decree of the Court of Chancery was reversed on appeal. The opinions in these cases are very brief, and do not inform us on what grounds they rest; but as they are sustained by no other decisions of which we are aware, unless it be some adjudications in Kentucky, which we have not seen, we suppose they are founded on a statute. In 1818, an act was passed by the Legislature of Virginia for the re-organization of the Chancery Courts, which contains a section in these words: "The said Courts in their discretion may direct an issue to be tried, whenever it shall be judged necessary, either in those Courts, or any other Courts whatever, as justice or convenience to the parties may require: and in all other cases, the mode of trial shall be the same as hath been heretofore used and practised in the Courts of Chancery

of Virginia." (1 vol. Rev'd. Code of 1819.) Now we are inclined to think, that this enactment must have influenced the decision of the cases cited; the more especially as they overrule the case of Nice v. Purcell, which was decided previous to its passage.

In Kentucky, the Legislature have made some provision in regard to the directing of issues; but to what extent the practice in that State is controlled by a statute, we are unprepared to say.

But even conceding to the later Virginia cases the force of authority here, and we think they do not sustain the argument for the plaintiffs. The weight of evidence so strongly preponderates in favor of the complainants, as not to require the verdict of a jury to inform the conscience of the Court. There is no irreconcileable conflict in the testimony, except as it respects two of the witnesses of the plaintiffs in error, and these are entirely outweighed by the complainants' evidence.

The question now presented to us is, not whether the Chancellor would wisely have exercised his discretion in directing an issue, but whether he has invaded the prerogative of the jury by deciding for himself the questions of fact. To maintain the affirmative, would be to determine, that every controverted fact in a suit in equity, must be referred to a jury. For such a proposition the plaintiffs' counsel would not directly contend. Its establishment would overturn some of the oldest rules of practice in equity, and unsettle to a great extent the course of proceeding there.

The principal matter in controversy in the case before us, is *exclusively* cognizable in equity, and according to the cases cited from Kentucky, might be determined by the Chancellor without the intervention of a jury, no matter how contradictory the evidence.

We will not undertake to say that an appellate Court may not reverse a decree on the ground that an issue was not directed, where it appears the facts were so much disputed, as to render it impossible by an application of the ordinary tests to explicate them. In such a case, a *viva voce* examination of witnesses before a jury, it seems to us would be all important. But in the present case, the facts are not thus involved, and the Chancellor properly decided them with out the aid of a ju-

ry; the more especially as an issue was not asked.` And such was the view taken by the plaintiffs' counsel at the argument; for it was not then pretended, that an issue should have been directed; but it was argued, that the Chancellor had erred in his conclusion both upon the law and the facts.

The counsel for the plaintiffs also insists, that it is important to the moral influence of Courts, that they should command the highest respect and reverence, and that the Judges should not provoke heart burnings and dislike; but their proceedings should be so directed as to bring satisfaction and content to the parties. That as the decision of the facts in the present case involve a high degree of responsibility, and will in all probability produce great dissatisfaction on the part of the unsuccessful party, this Court should impose that duty on a jury whose number and organization would relieve them from serious complaint, and whose means of ascertaining the truth by a *viva voce* examination of witnesses as far as practicable, would satisfy all parties. The character of the learned counsel who addressed to us this argument, is such as to assure us that it was made in seriousness, and it demands from us a respectful answer.

We are certainly not indifferent to the voice of public approbation, but the monitions of the " still small voice of conscience," address us in louder and more commanding tones, and we cannot hesitate to yield to it a paramount obedience. It is not only the duty of a Court to decide correctly, but in such a manner as to give general satisfaction, if it be practicable. But, the first duty is correctness of decision; and this is not to be lost sight of, however unpopular it may be. Courts do not possess the power to make or modify the law at pleasure—this is the office of the legislator. Judges can only declare the law as they find it. The Court of Chancery, we have shewn, did not err in adjudging the facts of the cause; and this Court cannot, without overstepping the utmost verge of its legitimate powers, hesitate to examine the decree of the Chancellor both upon the law and the facts.

We have always supposed that a high moral and official responsibility rested upon us for all our decisions here; but we are not aware, that in any instance our moral courage has faltered; and we are quite sure that we have never stopped to

Kennedy's heirs and executors v. Kennedy's heirs.

calculate consequences to ourselves personally. When we shall find that we are wanting in nerve to follow the dictates of duty, we trust that there will be enough of patriotism and self-respect left, to induce us to throw from us the ermine ere it become tarnished. But we must stop this course of remark —what we have said, seemed to us to be called for by the argument we have noticed.

*Third*—The answer in this cause does not set up a title to any part of the lands conveyed by the deed of December, 1824, as distinct from, and independent of, the deed itself; and we cannot consequently know, that Joshua Kennedy acquired a part of these lands by the purchase of a superior and paramount title. But the plaintiffs in error cannot, if such be the fact, be prejudiced by the decree of the Chancellor. The decree merely sets aside the deed from William to Joshua Kennedy, and directs a conveyance to be made of the lands embraced by it, to the complainants. The terms of this conveyance are to be settled by the Master under the supervision of the Chancellor; and it will not, of course, be so framed as to require the executors of Joshua to convey any other estate than was received from Wm. E. Kennedy and confirmed by the United States; unless it be a quit claim or other confirmatory conveyance operating upon it. If the title conveyed by William to Joshua was legally defeated by the judgment of a Court by one independent of, and superior to, it, and Joshua acquired this latter title, the rights of the parties to the property thus situated, must be adjusted in some future controversy; unless it shall be found practicable to raise the question on exceptions to the Master's report.

*Fourth*—In respect of the objection that the decree prescribes no time when the infants, against whom it is rendered, may impeach it, after attaining their majority, it is enough to say, that the statute ascertains the time; and, therefore, it need not be repeated in the decree. [Cato v. Easley, 2 Stewart's Rep. 214.]

The immense value of the property involved in the decision of this cause, and the interest it has consequently excited, has induced us, contrary to our usual practice, to furnish an answer in writing to the petition of the plaintiffs. And it remains but to add, that a re-hearing is denied.

Judge GOLDTHWAITE not sitting.