## ATWOOD v. SMITH.

1. A court of chancery will direct an issue to be tried at law only in those cases where doubt is produced in the mind of the chancellor, either by the nature of the proof itself, or by reason of conflicting evidence.

2. Although an issue has been directed to ascertain the sanity or insanity of an individual at the time of making a contract, and the verdict of insanity is returned by the jury, and the judge trying the cause certifies that he cannot say it was improper, yet an appellate court must disregard these proceedings, if the evidence at the hearing of the bill was such that the chancellor should have decreed on it in the first instance.

3. Where one partner is bound to attend personally to the business of the firm, and afterwards becomes infirm in mind by reason of intemperance, a court of equity will not be authorized to set aside an agreement then made for the dissolution of the concern, on the ground of fraud and imposition, when that is to be inferred only from the fact that profits have been realized when loss was anticipated.

Writ of Error to the Court of Chancery for the Thirteenth Chancery District.

THE bill in this case is filed by Smith against Atwood, and its object is to set aside an agreement entered into between them on the 22d July, 1841, dissolving a co-partnership previously existing, and also to set aside a deed for a lot of land, of the same date, on the ground of the insanity of the complainant at the time of executing them, as well as for an account and settlement of the partnership.

The answer denies the fact of insanity, and proof being taken, the cause was heard on bill, answer and testimony. The chancellor directed an issue to be tried in the circuit court. This was accordingly tried, and a verdict returned

Atwood v. Smith.

that Smith, on the 22d of July, 1841, at the time the agree-
ment and deed were made, was deranged in mind, and not of
sufficient mental capacity to give his free and voluntary con-
sent to the said agreement and deed.    The circuit judge cer-
tified to the chancellor that he could not say he was dissatis-
fied with the verdict of the jury.    From the nature of the
testimony, and the general complexion of things on the trial,
he would not however have certified against the verdict of
the jury, let it have turned either way.

A motion was made to the chancellor for a new trial,
which he refused, and adopted the verdict as the basis of his
decree.

As the decision of the case involves the consideration how
far the award of the issue was proper, it is necessary to set
out the evidence touching the insanity of the complainant.

Mr. Malone knows the parties—the complainant since
1835.    They commenced business as partners at Prairie
Bluff in '37 or '38.    They dissolved in July, 1841.    From
May '40 to May '41 the firm sold $31,000 of merchandise—
the business was conducted entirely by the complainant, with
the aid of clerks.    The witness' belief was that the com-
plainant was not in his right mind; for a month or two pre-
vious to the 22d July, '41, and after that date, the conduct
and deportment of the complainant was not that of a man of
sound mind and memory; he came repeatedly to the store of
Burke & Radcliff, in June and July, walked behind the
counter, and examined many of the books of that firm, with-
out invitation, and without saying a word, afterwards closing
them and walking out entirely silent.    This he had never
done previously.    On another occasion, in July '41, the wit-
ness saw him walking the streets at 12 or 1 o'clock at night;
he also came up into the second story of a house where the
witness was sitting up with a sick man; he then had nothing
on but his shirt; he acted in this manner some two or three
times in that month—going up to about the head or last step
of the stairs, and returning without saying a word.    Witness
knew the complainant's habits, and never saw him drink
spirits, and never saw him drunk; there was no change for
six weeks, embracing the whole of July; at some times dur-
ing this period he appeared more bright and talkative, and at

others the contrary. The complainant left Prairie Bluff in August, 1841, and returned in April, '42—the condition of his mind considerably improved. Previous to the 22d of July, '41, the defendant, in a conversation with the witness, told him the complainant was crazy, and believed it to be on account of a young lady then named.

On cross-examination, this witness answers that he heard the complainant say previous to the dissolution, that the firm had done a losing business; he also heard him say he had $15,000 surplus, and again in June or July, that he believed he had injured the defendant, and would be glad to get out of the firm. From the commencement of the firm's business until June '41, the complainant was attentive to business and applied himself closely to it; from June until the dissolution he paid little or no attention to the business of the store, but spent the days during that period in walking about the streets from one house to another. At the time of taking the deposition, the complainant was the same as he was previous to June '41, and was in this condition on his return in April '42. The village of Prairie Bluff in June and July '41, was extremely sickly, and the care and responsibility consequently devolving on the defendant, by complainant's absenting himself, was burthensome and oppressive.

Mr. Ellis, at the time of taking his deposition, had known the complainant five years—the annual sales of the firm were about $25,000, and the partnership continued for some two years. Witness considered the complainant insane at the date of the agreement, that is, in June and July '41—for a month or two previous to the 22d July, and afterwards, his acts were different from those of a man of sound mind—about that time he neglected his business, spent most of his time in striding up and down the street—he frequently went into merchants' stores, and even behind their counters, opened their books and examined them without permission, then went out without making any remark. This the complainant had never done previous to June, '41, so far as the witness knew. He also appeared very restless and melancholy —often spoke about the business of his concern, stating it was doing a losing business—that he had made a purchase of goods on too short payments, so that it would be difficult to

meet them—this was his constant theme, and he also, at the
same time stated the profits of the concern were from ten to
eighteen thousand dollars—the complainant left Prairie Bluff
the 2d of August, '41, and was absent about six months—
the condition of his mind is better now than it was when he
left.   Witness had never seen the complainant drunk much.
About June, '41, he heard the defendant say, the complain-
ant was neglecting his business and drinking too much, and
he wished the complainant would either go back to his busi-
ness at the store, or go to the defendant's plantation and shoot
squirrels, so as to quit his present habits.

On cross-examination, this witness deposes that he heard
the complainant say, his reason for not answering letters writ-
ten by the defendant when in Maryland was, that he did not
wish his friends there to know that he had been intemperate
in this State.   With reference to taking some money, the
the complainant had taken it to bear his expenses, and charg-
ed himself with it.   Afterwards he returned it to the iron
chest, supposing he should not go, and erased the entry ; sub-
sequently he took the money and renewed the entry.   This
was done the 2d of August, '41.   The witness deposed also
to the complainant's conversations, in which he said he was
afraid the firm had done a bad business, and that it was un-
profitable.   At the same time he said the firm had made a
profit of ten or fifteen thousand dollars—that he had injured
the defendant in the management of the business—that in
his last purchases he had made a very bad selection of goods
in New York, and had made the payment of the notes on so
short a time, that it would be difficult to meet them, and
thereby he would injure the defendant. These conversations
took place before he left for Maryland. The complainant's re-
collection now, of occurrences which took place at and before
the dissolution is good.   On re-examination, the witness is
positive, the complainant, in June and July, '41, was not
competent to transact his own, or the business of the firm.

Mr. Hall had known the complainant for six or seven
years.   About the 22d July, he appeared to be different in
his general and private conduct from what he was and had
been six months previously.   His conduct was different from
113

that of a man of sound mind. Witness came to this conclu-
sion, from the manner in which he neglected business, and
from the manner in which he spoke of it—stating the firm
was doing a bad business, and that he was injuring the de-
fendant by his last purchase of goods. He strolled about
town at times when he should have attended to business—
talked strangely of himself and business, sometimes saying he
was better, then again that he was worse. He also said he had
the horrors, and that he sometimes drank too much. His
mind, after his return from Maryland, was in its usual condi-
tion, and as it was previous to June, '41. He heard the de-
fendant say, previous to July 22d, '41, that something was
the matter with complainant—that he was afraid he was go-
ing crazy about a young lady then named, and if he did not
do better the defendant would have to dissolve the firm, but
did not wish to do so, because it would embarrass the busi-
ness, and would injure him much. Defendant wanted the
complainant to go to his plantation, and remain there until
he became more steady, for he had discovered the complain-
ant drank too much, and for this reason he had locked his
cellar. In the same conversation, the defendant said, he
could compel the complainant to remain and close the busi-
ness, but he did not know but it would be better to let him
off.

On cross-examination, this witness stated, that at the in-
stance of complainant and defendant, he went to Wetumpka,
to ascertain the chance of selling a stock of goods there—
the proposition was made by both. The complainant went
to Dayton, and said he was going to look out a location to
sell part of the stock of goods. This was about the time the
goods were received. Witness has been a merchant—saw
the stock of goods, and thought at the time they were too
many for the market. Heard both parties say they had
bought too many goods. Witness does not think it possible
for the firm to have paid bills maturing in October from a
stock of goods purchased in April. He heard the complain-
ant say previous to the dissolution, but not afterwards, the
firm was doing a losing business, and was afraid he was in-
juring the defendant.

On the re-examination by the complainant, the witness

states, he heard the complainant say that he drank too much, but the witness did not remember that he ever saw him drunk. During the period previously spoken of, the witness did not think the complainant, at times and periods, competent to attend to business correctly. ·

Doctor Fant testified, he was acqainted with both parties since '40 ; that during a portion of June and July, '41, the complainant's condition was different from what it had been previous to that time—could not say that it was different from that of a man of sound mind and memory ; cannot form any comparison of complainant's sanity or insanity from witnesses previous knowledge of him. Cannot speak of him professionally, as he never was called in. As a physician, he does not think that persons who have been insane are apt to recollect, after the mind is restored, all that occurred during their insanity. On cross-examination, the witness testified, he was not intimate with the complainant at any time, nor does he know that the complainant drank to excees ; believes he was under the influence of liquor more or less ; never saw him drink, but has seen him when witness believed him to be under the influence of liquor—his conduct now is more calm and composed than it was about June and July, '41— he now looks rational, and so far as the witness knows, he talked so then—he is not in the state now, that he was then.

Mr. Holt testified, the complainant boarded with him in July, '41, and he, during that month, acted like a man usually does when he is about half drunk; he never believed the complainant was unsound in mind, further than the influence of liquor. Witness knew his habits up to 22d July, '41 —saw him drinking off and on for about six weeks previously, and in the opinion of witness the complainant during that time, was under the influence of intemperate drinking ; the effect this had on him was, to cause him to neglect his business, and to stroll about the streets. When the complainant returned, his mind was about like it was prior to to the period he took to intemperate drinking.

This witness, on cross-examination, testified, he heard the complainant say, after his return from Maryland, he would be satisfied with his settlement with the defendant, if the

latter would give him a certain note left in the iron chest, due from him to defendant, and also convey to him a lot of ground which he had previously conveyed to defendant, before he went to Maryland. Previous to the dissolution, the witness heard the complainant say he had injured the defendant in the purchase of the last stock of goods on two short payments; that Dexter had sued the defendant for a large sum, and defendant would not be able to meet the payment for the goods, and by that means the firm would be embarrassed, and complainant wished to get his name out of the firm.

Mr. Radcliff testified, he was a merchant, doing business at Prairie Bluff; during the period of the alledged insanity of the complainant, his acts and conduct induced witness to suspect his sanity; during that time, he several times came to witnesses store, went behind the counter, turned over and looked through the witness' books, would then pass out without any apparent motive or design. For the purpose of satisfying himself, the witness, as to the complainant's unsoundness of mind, he asked him what was the matter, and the complainant said sometimes he had the horrors, at other times the firm was broke—on other occasions he would insist on witness going over to his store, and purchase goods at New York cost. Witness did go at different times, and make purchases, but after suspecting complainant's insanity, was induced to resist further importunities on such terms. Witness believes, at that time the complainant was laboring under insanity. So far as the witness knew, the complainant was a man of sobriety. On his return he was sane. Witness heard the defendant speak of the complainant's insanity previous to 22d July, '41. Defendant said he did not know what was the matter with the complainant, unless he was in love with a certain young lady.

In answer to cross interrogatories, this witness testified, the complainant told him he had borrowed the index from one of defendant's clerks, and had copied off the names of customers. He showed witness some of the amounts opposite the names, which he had put down from recollection—he said he did not know he had it exactly right, but if he could get a fair shake at the books he could have it so.

Mr. Wilkins testified, the complainant's general conduct was such as to induce him to believe his mind somewhat affected, but did not consider him quite insane—he talked a great deal about his business, and would frequently leave it when his services were apparently needed. Witness knows the complainant's habits, and thinks he was intemperate for some time previous to the dissolution; thinks intemperance was one cause that affected his mind, and that when under the influence of liquor he would appear very stupid, and frequently sleep all day. This witness speaks of a similar declaration by the defendant, that the complainant was crazy, and his belief of the cause of it. Also, of the complainant's admissions as to bad purchases, and his desire to get out of the concern as he commenced.

Mr. Borden testifies, that he has known the complainant for six years, but was not intimate with him at the 22d July, '41; he was however well acquainted with him, and had been for two years. About that time, he appeared as usual, only not quite so attentive to business. Witness believes he was of sound mind, and very anxious to quit business.— His habits at that time were not good; he was seen drunk, and face very much bloated, and witness was very much surprised at his looks, until he found out his drinking; his general conduct appeared like a man destitute of any prospective business, and he would not apply himself to any duties of the store. Witness has no doubt he was as much sane as he generally appeared for the last three years. Witness has been clerk to the defendant since the dissolution.

On cross-examination he testified the complainant had applied to witness to rent his storehouse; this was a short time before the dissolution, he said to witness he would take it if he could divide the stock then on hand; that he had been doing a losing business for some time, and that he was glad to get out of the business; heard the complainant say, both before and after the dissolution, he had been doing a murderous business; that he had better been clerking for about $200 a year than to have been in the firm.

Mr. Cook believed the complainant was not of sound mind —the circumstances which led him to this conclusion were, in the first place, what rumor had said about him, and of his

abandoning business, when previous to that time he was very active and attentive; next walking about town, loafering, and other times setting at one place for a consideable time, with a melancholy face, and stroking his hand through the hair of his head.

Mr. E. H. Cook, has known the complainant during the whole period; has had but litte conversation with him since his return, but witness thinks he is more rational than when he left—the complainant has always talked rational to him; does not now act as he did in July, '41.

H. T. Brantly, knew the complainant, but was not intimate with him; can't say he has ever seen him act differently from a man of sound mind; has seen him look dejected; he looks now as he usually did, except the appearance of dejection is gone.

Mr. Dehart, was acquainted with the complainant intimately, in July, '41; about that time the acts of complainant would sometimes induce the witness to believe him unsound, but on other occasions he appeared rational. Some of the acts which induced this belief were, that he would sometimes say his head was deranged; again, that he wished he was dead—besides this, he totally abandoned his business, and did many other things which induced witness to think him unsound in mind. Upon the whole, his opinion was wavering, sometimes he thought the complainant of sound mind, and at others unsound—never saw the complainant drinking or drunk, and believes he was temperate.

Mr. Dexter testified, that he was absent from Prairie Bluff, in June and July, '41, but knew the complainant intimately in April and May of that year; during those months his conduct manifested a disordered mind, but witness never could discover any defect of memory; the tenor of his conversation was confined almost entirely to the business of the firm, saying that the firm had been doing a bad business previous to that time; that the purchase he had recently made in New York, was too large in amount, injudicious in the selection, and must inevitably result in considerable loss to the defendant; during part of April, and all May, the complainant did not attend to the business of the firm with the diligence formerly practiced, and was frequently walking about the streets to

the neglect of his business. About that time the complainant said his mortification was such, on account of the disastrous condition of the business of the firm, that he was at times tempted to commit suicide, and that if he had a sum of money at his disposal, to remunerate the defendant, he would give up the whole, if it took the last dollar he had, and that he would be glad to get out of the concern on any terms. Such conversations, and such acts induced the witness to believe him [disordered in mind; whether the assertions made by him were true, the witness does not know.

On cross-examination, this witness deposed, the complainant had told him he purchased the stock of goods in New York, with a view to its division, and that by so doing, he could settle the affairs of the firm more advantageously to himself—has never been able to discover the slightest defect in memory of the complainant, and believes his recollection is good as it ever was.

Mr. Bryan was present as a witness to the deed for the lot, executed in July, '41; its value was from eighty to one hundred dollars—saw no consideration pass—the complainant was sober and calm; the deed was executed early in the morning; witness was intimately acquainted with the complainant; about that time he acted differently from his usual manner, but in the opinion of witness this arose more from derangement of feeling than reason; he seemed melancholy from disappointment in business, for it was to business alone he attributed his feelings; complainant said no one could tell what he suffered. About this time witness saw the complainant under the influence of liquor; according to his belief, liquor produced the same effect on him as on other men; he was sane, so far as the witness knows. Witness was also called as a witness to the deed of dissolution. Complainant was calm and sober, and so far as the witness knew, was sane. Witness was clerk to the firm; has heard the defendant say he thought the complainant was crazy, or would go crazy about Miss ———. When the witness was called in the complainant had the deeds spread out before him, and was examing them. Witness went on with him as far as Halifax, N. C., and his conduct on the route was the same as that of travellers generally, except that he was melancholy,

dejected and reserved. Previous to the dissolution the complainant said he was a fool for not going out of the firm in January, 1841, for then the defendant would have given him $3,000 for his share of the profits, and have closed up the concern himself. Also, that his last purchase was so bad it would absorb about all the profits that had been made, and the defendant be injured, therefore the complainant was willing to go out without a dollar; his condition now is as it was formerly, with the exception of melancholy and drink; his recollection of occurrences which took place about the time of the dissolution, is good.

Mr. Robbins testified the conduct of the complainant was such as to induce him to believe him either love-sick, insane, drunk, or a fool. In '40, he was familiar with the witness, and wished to sell him goods, but in the spring or summer of '41, his conduct altered—he was less anxious to sell the witness goods, and once when he was walking the streets, with his hands in his pockets, and head down, the witness stopped him to talk about buying goods, but he turned off in an indifferent manner, which insulted witness. On another occasion, the complainant came to witness' house, and his manner then was such as to induce the witness to ask him what was the matter; he then said he believed he was most crazy, and wished he was dead. Witness asked him if he was not love sick, but he said no, but wished he was dead.

On the part of the defendant several witnesses were examined, and the substance of their testimony bearing on the question of insanity may be thus stated:

Mr. Marsh heard the complainant say, in June, '42, that he took to drink before the dissolution; and the reason was to bring that about, because the defendant had not put in the firm the amount of money agreed on, but instead took money out, and thereby embarrassed the concern; that the people here thought him crazy, but he knew well what he was about; that he took the course he did to get out of the concern; he admitted he had made bad purchases in New York, and in consequence of these drawbacks on the business, he did not care much what he did. He said the profits of the firm were $15,000.

Mr. Bennett has heard the complainant peak of the disso-

Atwood v. Smith.

lution as a matter in course. In June, 1842, he said the profits were $15,000; that previous to the dissolution he would not attend to business, in order to get out of the firm; that when in New York, he had laid in a supply of goods badly, in order to embarrass the concern; that defendant had not treated him properly; that complainant said he had laid in the stock of goods too much of one quality; that the stock might be divided, he taking part, and the defendant the other, but to this defendant objected; he also said he would be satisfied with the settlement, if defendant would make him a title to a certain lot of land which had been his, and give him certain notes which were his individual property, and which were left in his trunk when he went to Maryland. Subsequently he stated to witness the profits of the concern were $20,000 or $25,000, and that he was insane at the time of the dissolution, and did not know what he was doing. Witness was in company with complainant a short time before he left; if he was insane, witness did not know it, and if drunk, witness did not see him drink; at times the complainant appeared more stupid than usual.

Mr. Williams testifies that in July, '41, he with his wife made some purchases at the store, and after the goods were measured off, the complainant asked him if he had not confessed a judgment in favor of another person, and on receiving an affirmative answer, said he did not feel disposed to let him have any more goods on credit; witness then proposed to give back the goods, but the complainant refused to take them, but said the next he got he must pay down; that he thought the witness had more to pay than he would be able to pay.

Mr. Hazzle had business to transact with the complainant about the 22d July, '41; that he was at all times capable of transacting the business with witness.

Mr. Chadwick was in company of the complainant about that time; he appeared cast down; his countenance was different from what it used to be, but when questions about trading were asked him, he would answer as usual.

Mr. Whatted dealt a good deal with the firm; the complainant appeared to him to be sensible. After the dissolu-

114

tion, and before he left for. Maryland, the complainant said he had quit business; that he had risked too much; in answer to an inquiry if the defendant had settled with him, he said he had settled up like a gentleman.

Mr. B. Bennett saw the complainant frequently about the time alluded to; never has seen any alteration or difference since he first knew him; has heard the defendant say the complainant was in great trouble of mind about Miss ———.

Mr. Burgess Bennett states the complainant spent a night with him about the last of June or first of July, '41; he said the business was involved, and the firm would not be able to meet its payments; that he had purchased so many goods that the firm could not sell enough to meet its payments, and he wished to get out of the firm. Witness did not see any thing wrong about his mind, only that he appeared distressed on account of his business; his talk and actions did not differ from what they ordinarily were. Witness had no inducement to invite complainant to his house, and none was given until the complainant remarked that he would go out with him as he was walking. Never saw the complainant drunk, or knew of his drinking.

Mr. Johnson is a merchant at Prairie Bluff, and was in '39, '40 and '41; has heard the complainant frequently say previous to the dissolution, his firm had not made any thing; since the complainant's return, he has heard him say the firm had not made a dollar, and that all he wanted was for the defendant to pay up its debts. Witness left Prairie Bluff on the 8th June, '41, and did not return until October; he never saw any difference in complainant up to the time witness left, the complainant attended to business as usual; before witness left, he bargained with complainant for a bale of domestics, which the defendant refused to let him have, alledging the complainant had sold it too low, and remarking he was drunk, in love, or crazy.

Mr. Lore was a clerk in the concern at the time of dissolution; he was in the house when the articles of dissolution were signed; the complainant acted as a rational man, and seemed to understand his business. He was not attentive to his business; according to the rates at which goods were sold, the business could not have been profitable; complain-

ant was not at all times so insane, drunk or foolish, as not to know what he was about; at times he was despondent, and under the influence of liquor. In a conversation with complainant since his return, he said his intention was, when buying the stock of goods, to divide them with the defendant, and if he had succeeded in doing so, he would have had the defendant where he wanted him; witness slept in the same house with complainant; he was under the influence of liquor a portion of the day, but got up sober; he slept composedly; his conduct about this time differed from his former conduct in this, that he would go up stairs and spend a portion of the day.

Mr. Marshall saw the complainant frequently about the time alluded to, when he considered him under the influence of liquor; at times he appeared sober, and at others acted as a drunken man.

Mrs. Hall saw the complainant drunk once; she noticed his conduct was different from what it formerly was, and complainant told her it was caused by liquor.

Mr. Coates is one of the subscribing witnesses to the deed of dissolution, and the deed for the lot; he considers the complainant at the time they were executed was sane as he ever was, and knew as well what he was doing as he ever did; he said at the time he had as fine an opportunities for making money as any young man in the country; that he had fooled them away by selling goods at such short profits as not to make any thing; after his return to Alabama, the complainant said he was perfectly satisfied with the settlement, with the exception of the lot and one or two small notes given him for individual services; the lot he should and must have back. In May or June, '41, the complainant expressed to witness his desire to get out of the firm, and his reasons were, that it was embarrassed by his last purchases; these were made in March and April, at from four to eleven months, and made the firm unable to meet its engagements out of its own means. From frequent expressions of this wish, the witness believed it was the choice of the complainant to go out of the firm; witness was clerk and book-keeper for the firm; heard no conversation between the parties when the deeds were signed about the agreement, but had heard

both speak of it separately; the complainant did not read it, nor was it read to him in the presence of witness; he was called in by defendant, who stated what the writing was; it was in his hand-writing, as was also the deed; the parties were standing by the desk, and the paper lying on it before them.

Mr. Parsons is a resident of Maryland; states the complainant was clerk for him from the fall of '41 till January '42; he came there some time in the summer or fall of '41; witness was intimate with him; had known him fifteen or twenty years; had constant business relations with him whilst there; witness regarded him as perfectly rational the whole time; heard the complainant complain that defendant had either cheated him or was about to cheat him; said he had been engaged in business, but it was unprofitable owing to defendant's conduct; he conversed and acted as a reasonable and sensible man, and made an excellent clerk.

Mr. Maddox was also a resident of Maryland; was intimate with the complainant during the time he was there; was then perfectly sane; heard him say he had made money in trade, but ultimately was unsuccessful.

Mr. Lockwood states that he traveled with the complainant from Prairie Bluff by the river to Montgomery; had a conversation respecting his leaving; complainant said he thought the firm had lost money in trade, and in leaving, he had left the defendant to pay the debts; that he took but $125; witness remarked that would be scarcely sufficient to pay his expenses where he was going; complainant then said the defendant had urged him to take more, but he would not, because he thought the defendant would lose enough by the business if he paid the debts; during the passage he conversed rationally and sensibly; he seemed dejected, and had the appearance of having been unwell.

Mrs. Holt states her belief that the complainant was under the influence of ardent spirits about the time alluded to; he admitted he was so, in a private conversation with her.

By the articles of co-partnership the complainant was to devote his whole time and attention to the business, and receive one-third of the profits. The articles of dissolution recite the withdrawal of the complainant on account of his

Atwood v. Smith.

health, and the defendant to release him from all claims for losses, in consideration of having all the assets of the firm. They also recite the receipt by Smith of $100, in full discharge of all claims for profit, &c. The evidence before the jury was substantially the same as that previously detailed.

E. W. PECK, for the plaintiff in error, made the following points upon the errors assigned; and these open the whole case in all its aspects:

1. The mere fact that the issue here directed was found for the complainant, is not sufficient to sustain the decree. The object of an issue is to aid the conscience of the chancellor in a case of doubt and difficulty, but he is not bound to regard it. [Murlock v. Murlock, 1 Edwards, 18; Barker v. Ray, 2 Russ. 68.]

2. In this case, no issue should have been directed, as the case is neither of doubt or difficulty, when the evidence is looked into. The legal presumption is of sanity, [State v. Martin, 2 Ala. Rep. 48; 3 Bro. Ch. 441,] and if all the facts proved were pleaded, the ecclesiastical courts would not let the party in to proof. [Cartwright v. Cartwright, 1 Eccl. R. 51; Atto. Gen. v. Panther, 3 Bro. C. 441; Hoff. Ch. Prac. 502; Townsend v. Graves, 3 Paige, 438; Whalley v. Whalley, 3 Bligh.; Kennedy v. Kennedy, 2 Ala. 44; Johnson v. Hainsworth, 6 Ala. 450.]

3. There is no evidence of fraud, circumvention, imposition, or undue advantage, upon which a court of equity will interfere. Indeed, the fraud is all on the other side, as shown by the proof of design to embarrass the firm, and thus cause the dissolution.

4. If the conscience of the chancellor is to be governed by the verdict, a new trial should have been awarded, as it is clear there was no ground for the verdict on the proof before the jury.

5. The New York practice is for the party complaining of the verdict to state the evidence, and for the other party to correct it, and it is finally settled by the judge in case of dispute. [1 Hoff. Ch. Pr. 513.] The English practice is for the judge to certify the evidence from his notes. [2 Smith's Ch. Pr. 87.]

The court will judicially notice that the judge does not take notes, and the New York practice was pursued in this case.

J. A. CAMPBELL, contra, insisted that the evidence of insanity was sufficient to make out the complainant's case, [Combe on Ment. Derang. 196; Ray on Med. Jur. 142; 3 Curtis, 671; 2 Adams, 99,] and if so, a lucid interval was not shown. [1 Bro. Ch. 234; 2 Poth. on Ob. 579; Ray on Med. 322.]

The evidence of the fact of execution is not satisfactory, in connection with the other proof. [4 Pick. 32; 2 Phill. 69; 1 Hagg. 414; Ray, 243.]

The admissions of the complainant after his return do not affect the case; they only display ignorance, and that he labored under delusion. They were inadmissible, because they were not put in evidence. [6 C. & F. 39; 1 Molley, 352; 7 C. & F. 372; 6 Price, 240.]

The contract shows imposition, as the firm had done a large and prosperous business. The basis (according to Atwood's answer) of the settlement, was the accounts made up in April; the firm was then not only solvent, but entirely unembarrassed. The gross inadequacy is evidence of fraud. [1 Story Eq. 197 to 220; 2 Kent's Com. 450; Fonb. 47, 115 to 119.]

The court of chancery will not grant a new trial against the certificate of the judge, [Gibbs v. Hooper, 8 Con. Ch. R. 32,] nor will an appellate court generally reverse the opinion of the chancellor, [Bourke v. Bothwell, 2 B. & B. 56,] and great value is always given to the verdict of a jury. [1 Barbour's Ch. Pr. 461.]

As to insanity, the court of chancery invariably orders issues. [Stork on Non. Com. 27; 2 Beavan, 116.]

GOLDTHWAITE, J.—1. It is urged by the counsel for the complainant, that the usual practice of courts of chancery now is, to direct an issue at law, whenever a defect of capacity is relied on to set aside a contract otherwise valid. It seems the rule is thus stated by a recent annotator. [Stork on Non Com. 27.] We have looked into the cases cited by

this author, but cannot perceive they sustain his proposition to the extent asserted. [Att'y Gen. v. Panther, 3 Bro. C. 441; Hall v. Warren, 9 Vesey, 604.] The other case, 2 Beavan, 116, is not before us at this time, nor do we deem it essential to look particularly to it, as we presume it can scarcely go beyond the apparently well settled practice. No one, we presume, would contend a party was entitled to demand an issue, or that the court was required to direct one, if the proof was clear, or if no proof was made. It is very clear, on principle, as well as authority, that an issue is only directed in those cases where doubt is produced in the mind of the chancellor, either by the nature of the proof itself, or by reason of conflicting evidence. Whether there are cases in which some peculiar party is entitled to have an issue, it is unnecessary to inquire, as those, if they exist at all, are confined to heirs at law contesting a will, or when the establishment of a *modus* is the question. [1 Eq. Ca. Ab. 133; Harrington v. Hunter, 1 Bro. P. C. 140 : but see also 1 Young, 243, and O'Conner v. Cook, 6 Vesey, 671.] It is useless to examine the adjudications bearing on this subject in detail, as that was done in Kennedy v. Kennedy, 2 Ala. Rep. 625, in which the rule as above stated is ascertained, on a review of the principal cases.

2. There is no question the verdict of a jury upon the issue directed to be tried at law, is entitled to great consideration, but it is also entirely evident, that no weight whatever can attach to it, when the proof before the chancellor, in the first instance, did not warrant him in directing the issue— or in other terms, when the case made at the hearing was such as to entitle the one party or the other to an immediate decree. Such in our judgment is this case, and whatever of uncertainty was in our minds at the argument, has entirely vanished upon a cautious consideration of the evidence. It appears the complainant began to act strangely and unusually about the first of June, '41, and in the opinion of some of the witnesses was then deranged. The conduct from which this derangement was inferred, seems chiefly to be his neglect of business—his strolling about the streets at night, as well as by day—looking into the books of other merchants without their consent—together with much talking about

his own affairs ánd business. Now if these acts stood alone, without explanation, it seems to us it would be extremely unsafe to say there was a total aberration of mind; but when we look further to the evidence, all is sufficiently explained, and may be easily traced to its proper and legitimate cause. Those who associated with him in the common habitudes of eating and sleeping, state their knowledge—not opinions merely—that he drank, and was frequntly under the influence of spiritons liquors. Those who dealt with him speak of his performing the mental operations then called in play with the ordinary vigor, and the subscribing witnesses are certain he was calm and collected when he signed the deeds —or, as both of them assert, was perfectly sober. The principal act performed, and which he now seeks to avoid, seems to have been long contemplated, as well as desired by him. It is evident enough from his own declarations, as well as the other evidence, that the stock of goods purchased the spring previous to the dissolution, was not judiciously laid in, and therefore there was a possibility of his embarrassment, if not the certainty of his eventual loss. There seems to us nothing unreasonable in his wish to get out of the concern as he came into it, when the whole matter is looked to in a pecuniary view. Independent of this, we find him ten days after the dissolution, conversing of it in a rational manner, and apparently satisfied he had done well in getting rid of the business. He travels to Maryland a rational man—is employed there as a rational being—and returns after a lapse of a few months entirely restored, even to those who previously considered him as insane. It is not too much to say, that this is a most extraordinary case if one of insanity. In all this it will be observed, there is no conflict of evidence— no statement by one witness of facts which are inconsistent with those stated by others. The only conflict is, in the opinion of the witnesses as to his real condition, and we think it perfectly clear, the impressions of these were well founded, who attributed his eccentricities to the influence of liquor.

3. There is another view of the case, which has been somewhat pressed. It is said the defendant took advantage

of the unfortunate condition in which his partner had placed himself, and made an unconscionable bargain. There is no proof satisfying us that this was the case. It is doubtless true, the firm had made money previous to laying in the last stock of goods, but the share coming to the complainant, was but a third, and he was bound to devote the whole of his time to the business. When we take into consideration the prospect of loss upon the stock—the delay in closing the business; and that the defendant would be called on to give his attention to it, when by the articles of copartnership, he was to be relieved from any duties whatever, we cannot say any advantage was taken of the complainant. We do not deem it necessary to go further into the case, as what we have said is sufficient to indicate that the bill of the complainant is not sustained by the evidence, as no sufficient doubt was produced to warrant an issue.

The decree of the chancellor is therefore reversed, and the bill dismissed with costs.